```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/29/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
OLUDOTUN AKINDE,                                    :
                                                   :
                               Plaintiff,          :
                                                   :          1:16-cv-8882-GHW
              -against-                            :
                                                   :          MEMORANDUM OPINION
NEW YORK CITY HEALTH AND HOSPITAL :                           AND ORDER
CORPORATION,                                       :
                                                   :
                               Defendant.          :
------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

I.      INTRODUCTION

       On September 12, 2016, Plaintiff Oludotun Akinde was placed on involuntary leave from his

employment as a coordinating manager at Harlem Hospital, which is a member in the hospital

network run by Defendant New York City Health and Hospital Corporation's ("Defendant" or

"HHC").  Proceeding *pro se*, Plaintiff asserts that Defendant's decision to place him on involuntary

leave constitutes discrimination and retaliation in violation of Title VII and the Americans with

Disabilities Act (the "ADA"), and also argues that Defendant's decision violated his due process

rights.

       Defendant moved for summary judgment.  Because it is undisputed that Plaintiff behaved

bizarrely at work prior to his being placed on involuntary leave, and it is similarly undisputed that he

received a hearing and opportunity to appeal after he was placed on leave, Plaintiff's due process

claims cannot survive.  Neither can Plaintiff's claims for retaliation and discrimination under Title

VII and the ADA.  Accordingly, Defendant's motion for summary judgment is granted.

## II.     BACKGROUND

### A.  Factual Background[1]

Plaintiff was hired as a coordinating manager at Harlem Hospital on or about February 21, 2006.  Defendant's Local Rule 56.1 Statement of Undisputed Material Facts, Dkt. No. 110 ("Defs. 56.1 Stmt.") ¶ 21.  In 2014, he was assigned to work in Harlem Hospital's materials management department as a coordinating manager-level B.  *Id.* ¶ 22.  His duties in that role included supervising staff to ensure that supplies were delivered according to the needs of patient care areas, and also included "[m]anagerial skills-leadership, prioritization, training, ability delegate, performance, monitoring, [and] staff supervision."  *Id.* ¶¶ 24–25.

#### a.  Plaintiff's Behavior at Work

In or around August 2016, Plaintiff began exhibiting "behaviors that raised concerns" at work.  *Id.* ¶ 26.  For instance, he started wearing gloves, claimed that there was an irritant on his desk, and covered his chair with plastic bags because he believed that his fellow staff members were putting harmful chemicals on it.  *Id.* ¶ 26.

On September 12, 2016—the day he would ultimately be placed on involuntary leave—Plaintiff told his supervisor, Mark Sollazzo, that storeroom staff had put formaldehyde on the gloves that he was using and that they were trying to harm him.  *Id.* ¶ 27.  Plaintiff further claimed that two of his coworkers were stalking him and had broken into his home while he was at work.  *Id.* ¶ 29.  Plaintiff showed Mr. Sollazzo a photo of two individuals, claimed that they were his coworkers, but Mr. Sollazzo did not recognize them as employees of Harlem Hospital.  *Id.*  When Mr. Sollazzo told Plaintiff that he did not recognize the individuals, Plaintiff said "don't you see that they are wearing a mask[?]" and also that "[t]hey disguise themselves, but I can see through them."  *Id.* ¶ 30.

---

[1] The following facts are drawn from Defendants' Local Civil Rule 56.1 Statements and other submissions in connection with these motions and are undisputed or taken in the light most favorable to Plaintiff, unless otherwise noted.

Mr. Sollazzo was alarmed by Plaintiff's comments and notified the hospital's police, seeking to have Plaintiff escorted from the building. *Id.* ¶ 31. While Mr. Sollazzo waited for the police, Plaintiff told him that a staff member had given him a cupcake that was injected with a chemical, and that another coworker was stalking him and going through his medical records. *Id.* ¶ 32. Mr. Sollazzo commented that other staff were concerned for their safety as a result of Plaintiff's behavior. *Id.* ¶ 33.

In response to these events, Maria Campos, a personnel representative at HHC, contacted Shari Singleton, a labor relations specialist at HHC, to discuss Plaintiff's behavior. *Id.* ¶ 34. Mr. Sollazzo had told Ms. Singleton that Plaintiff was "claiming that people wearing masks were trying to kill him and further learned that Plaintiff's department felt that he would be a danger to himself and other employees." *Id.* ¶ 35. As had Mr. Sollazzo, Ms. Singleton contacted the police seeking to have Plaintiff escorted off the premises. *Id.* ¶ 36.

### b. Plaintiff Is Placed on Regulation 1 Leave

Ms. Singleton also went to see Plaintiff so that she could explain that Plaintiff was going to be put on "Regulation 1 involuntary leave." *Id.* ¶ 37. Under HHC's Regulation 1 leave policy, an employee can be required to undergo a medical assessment conducted by an independent physician affiliated with HHC's Personnel Review Board ("PRB"). *Id.* ¶ 16. If that physician concludes that the employee is unfit to perform their duties, the employee is placed on an involuntary leave of absence. *Id.* ¶ 17. The employee can object to that determination and request a hearing before the PRB. *Id.* If the PRB confirms that the individual cannot perform their essential duties, that employee will be placed on a leave of absence of up to one year. *Id.*

In situations where the relevant official determines that there is probable cause to believe that the continued presence of the employee on the job is a potential danger to persons or property,

or would seriously interfere with operations, the official may place the employee on an involuntary leave of absence pending the medical assessment hearing and a final determination.  *Id.* ¶ 18.

In Plaintiff's case, Ms. Singleton arrived at Plaintiff's worksite and noticed that Plaintiff was wearing latex gloves, had covered his chair in plastic, and sat on top of folded newspapers.  *Id.* ¶ 38. Ms. Singleton explained that he would have to be escorted off the property, and Plaintiff "appeared agitated."  *Id.* ¶ 39.  Plaintiff then told Ms. Singleton that the director of the HHC/Harlem Hospital police had followed him on the "2 train" and showed a photo of the person who he claimed to be the chief of police.  *Id.* ¶ 42.  Ms. Singleton confirmed that it was not a photo of the chief of police. *Id.*  Plaintiff also told Ms. Singleton that hospital employees were following him, trying to kill him, and had placed irritants on his desk.  *Id.* ¶ 42.  He showed Ms. Singleton and Detective Stephen Marshall, who had accompanied Ms. Singleton, and Detective Marshall confirmed that the individuals in the photos were not hospital employees.  *Id.* ¶ 43.

After this exchange, Ms. Singleton issued Plaintiff a letter informing him that he was being placed on Regulation 1 leave pending a physician's evaluation of Plaintiff's fitness to perform the duties of his job title.  *Id.* ¶ 44.  Plaintiff asked Ms. Singleton to issue a written statement that she would investigate his claims, and Plaintiff wrote a statement on the letter she had provided him with. *Id.* ¶ 45.  Ms. Singleton signed and dated the letter, and Plaintiff was escorted off the premises.  *Id.* ¶¶ 45–46.

### c.  Plaintiff Undergoes a Psychiatric Evaluation

On October 19, 2016, Plaintiff was examined by Roger A. Rahtz, a PRB-affiliated, board-certified psychiatrist.  *Id.* ¶ 47.  In his report, Dr. Rahtz commented that Plaintiff, "demonstrate[d] persistent beliefs that he is under attack by co-workers, and has no insight into the distortions of reality involved in these beliefs."  *Id.* ¶ 48.  He diagnosed Plaintiff with Paranoid Delusional Disorder with persistent and fixed persecutory delusions.  *Id.*

Dr. Rahtz concluded that Plaintiff was "NOT currently capable of returning to his duties as Coordinating Manager B," noting that Plaintiff was medically unable to perform the essential duties required in that position. *Id.* ¶¶ 48–49.  He notified Plaintiff of his right to apply for a return to duty and his right to request a hearing regarding the decision to continue his involuntary leave of absence. *Id.* ¶ 49.

### d.  Plaintiff's PRB Hearing

On December 5, 2016, Plaintiff requested an appeal of his Regulation 1 leave, and a PRB hearing was held on January 4, 2017. *Id.* ¶ 50.  Plaintiff was represented by counsel during that hearing. *Id.* ¶ 51.  Witnesses, including Dr. Rahtz, Ms. Singleton, and Officer Marshall testified under oath on behalf of HHC, and were subject to cross examination by Plaintiff's counsel. *Id.* ¶ 52. Those witnesses also included a number of Plaintiff's former co-workers, who uniformly reported that Plaintiff had behaved bizarrely prior to his being placed on involuntary leave, including by accusing his co-workers of being "gang members" and trying to poison him. *Id.* ¶¶ 53–56.

After that testimony, the PRB hearing officer, Peter A. Korn ("Hearing Officer Korn") sustained HHC's decision to place Plaintiff on Regulation 1 leave. *Id.* ¶ 57.  Hearing Officer Korn explained

> I find the testimony of the HHC staff to be persuasive in that [Plaintiff] exhibited bizarre behavior inappropriate in a workplace, disruptive to the efficient operation of his unit, resulting in work performance that affected the reasonable comfort of his co-workers.  The testimony and psychiatric report of Dr. Rahtz are equally persuasive in determining that [Plaintiff] has a clinically significant psychiatric disturbance, including paranoid personality disorder, which adversely affects his ability to do his job and which is probably the cause of his behavioral and performance issues.

*Id.*  On February 28, 2017, Indramattie Harrilall, a director of human resources at Harlem Hospital, agreed with Hearing Officer Korn's recommendation and upheld Plaintiff's involuntary leave. *Id.* ¶ 58.

Plaintiff requested an appeal of that determination by letter dated March 31, 2017. *Id.* ¶ 59. The PRB appeal board determined that Hearing Officer Korn's decision was "soundly based on the testimony and evidence presented and was neither arbitrary nor capricious." *Id.* ¶ 60.

e.   **Plaintiff Requests to Return to Work**

In spring 2017, Plaintiff requested a return to duty from his Regulation 1 leave. On or about May 5, 2017, Plaintiff was evaluated by PRB affiliated-physician Sandra Kopit Cohen consistent with Defendant's Regulation 1 leave policy. *Id.* ¶ 61. In addition to meeting with Plaintiff, Dr. Cohen reviewed records provided by HHC and Plaintiff regarding his Regulation 1 leave and psychiatric history to aid her in her evaluation. *Id.* ¶ 62. Dr. Cohen also considered psychiatric evaluations that had been conducted by two private physicians that Plaintiff had visited. *Id.* ¶ 62. One of those evaluations, performed by Dr. Nwokeji Kingsley on November 18, 2016, had determined that Plaintiff's mental status was "unremarkable." *See* Declaration of M. Adil Yaquoob in Support of Defendant's Motion for Summary Judgment, Dkt. No. 107 ("Yaquoob Decl.") Ex. M at 2; Dkt. No. 123-79 at 5. The other, performed by Dr. Bruce Schweiger, concluded "Oludotun Akinde has no psychiatric disorder and is capable of working." Dkt. No. 123-4 at 3.

After considering those materials and meeting with Plaintiff, Dr. Cohen commented

[Plaintiff] has developed similar difficulties in three time periods, and two work positions which involved different supervisors, coworkers, representative from Labor Relations and from the Hospital Police. In the three episodes, [Plaintiff]'s difficulties have been described by different observers in quite similar ways. [Plaintiff] explains this sequence of events as entirely being the result of his reporting fraud at Harlem Hospital. While [Plaintiff]'s linking of these series of events might seem plausible on the surface, his specific belief that a coworker would try to kill him by offering him a poisoned mini cheesecake or that other coworkers would injure him by contaminating his work station is odd. His theory of events requires a conspiracy of a significant number of employees across different hospital departments to be working in concert to harm him. These beliefs are not at the extreme of bizarreness that can be seen in Delusional Disorder (where at the extreme an individual can believe that their organs have been removed and replaced with

alien organs), but are nevertheless on the spectrum of bizarreness associated with Delusional Disorder.

Defs. 56.1 Stmt. ¶ 63.  Dr. Cohen concluded

> In my professional opinion, [Plaintiff] is currently able to return to work.  However, even while on leave, [Plaintiff] has only had a partial remission of the symptoms of Delusional Disorder.  His return to work may cause an exacerbation of these symptoms. Employment that involves supervisory work or frequent teamwork, is particularly likely to trigger acute paranoid delusions.  Therefore, it is my recommendation as an (sic) Board Certified Psychiatrist with a specialty In Organizational and Occupational Psychiatry that on his return to work [Plaintiff] not be assigned to supervise other employees.  Moreover, I strongly recommend that [Plaintiff] be assigned to a position with clearly delineated work product which [Plaintiff] can perform on his own and which does not require coordination with teammates.  Such an assignment will minimize friction with coworkers due to [Plaintiff]'s Obessiive(sic) Compulsive Personality Disorder, and more importantly reduce the likelihood of an exacerbation of his Delusional Disorder.

*Id.* ¶ 64.

HHC's Office of Labor Relations forwarded Dr. Cohen's report to HHC's Office of Equal Employment Opportunity (the "EEO") on or about August 22, 2017.  *Id.* ¶ 65.  The EEO was to determine whether, in light of that report, Plaintiff could return to work in his former position.  *Id.*  The EEO concluded as follows:

> [A]fter a review of this request for a reasonable accommodation in connection to [Plaintiff]'s Regulation I application for reinstatement, including, but not limited to, an interactive discussion with [Plaintiff]'s Department concerning the essential job functions of the position and a review of his functional job description, this request for a reasonable accommodation cannot be approved because this Office has determined that [Plaintiff]'s current work restrictions, including his inability to supervise staff and/or to work with other coworkers, prevents him from being able to perform his essential functional duties, with or without a reasonable accommodation, in his capacity as a Coordinating Manager - Level B in the Stores Department at Harlem Hospital

*Id.* ¶ 66.

### f.  Plaintiff's NYSDHR Complaint

Plaintiff filed a complaint with the New York State Division of Human Rights (the "NYSDHR") on May 16, 2018.  *Id.* ¶ 67.  That complaint alleged that HHC had refused to reinstate

him from Regulation 1 leave based on his race, previous medical condition, and in retaliation for former complaints of discrimination. *Id.* The NYSDHR dismissed Plaintiff's complaint on November 9, 2018, determining that Plaintiff had not proffered any evidence that HHC's "refusal to reinstate him was motivated by discriminatory animus based upon race." *Id.* ¶ 68; *see also* Yaqoob Decl., Dkt. No. 107, Ex. O, at 4. The NYSDHR also determined that Plaintiff's prior complaints had been made in 2013, such that there could be no inference of causality between those complaints and the denial of his request for reinstatement in 2016. *Id.*

### B. Procedural History

Plaintiff filed his complaint on November 14, 2016. Dkt. No. 2. He alleged claims of discrimination, hostile work environment, retaliation, and due process violations against HHC stemming from his September 12, 2016 Regulation 1 leave. *Id.* Defendants—which, at that time, included Ms. Singleton—moved to dismiss. Dkt. No. 11. On July 7, 2017, the Honorable Katherine B. Forrest issued an order granting that motion. Dkt. No. 24. Plaintiff appealed, and the Second Circuit remanded for further proceedings on October 9, 2018. Dkt. No. 28. On remand, the case was transferred to this Court. *Id.*

On November 30, 2018, Defendants again moved to dismiss. Dkt. No. 34. On September 13, 2019, the Court granted in part and denied in part that motion, ultimately allowing Plaintiff's Title VII and ADA claims against HCC to proceed, and granting Plaintiff leave to amend his § 1981 and § 1983 equal protection claims. *See* Dkt. No. 47.

On September 25, 2019, Plaintiff filed a letter titled "Amended Complaint" with the Court. Dkt. No. 49. That complaint named only HCC as a defendant. *Id.* That amended complaint referenced conduct from as early as 2009, alleging for instance, that Plaintiff had been called racial slurs, that Plaintiff had reported an "abusive and hostile work environment to the office of the Mayor of New York city" in 2011, and that "[t]he Mayor personally called me and told me to report

to the New York State Division of Human Rights of the EEOC." *Id.* at 2.  Plaintiff also alleged that

he had not been invited to a hospital Christmas party in 2012, and that an "Assistant Director"

named Emily Peters had told him that he was not invited because "people think you are crazy." *Id.*

at 4.

The amended complaint also alleged that Defendant had retaliated against him "using

Regulation 1 Policy as smoke screen." *Id.* at 9.  Plaintiff asserted that "Nicole Phillips admitted that

I was fired immediately after reporting that the defendant staff came to my home on 9/10/16 to

threaten me to withdraw my April 29, 2016 case against defendant or risk being fired." *Id.*

On October 31, 2019, the Court determined that the amended complaint did not "cure any

of the deficiencies in the Court's September 13, 2019 opinion with regard to Plaintiff's § 1981 and

§ 1983 equal protection claims" and dismissed those claims with prejudice.  Dkt. No. 51, at 1.

Defendant moved for summary judgment on April 5, 2021.  Dkt. No. 107 ("Mot.").

Defendant filed a response to that motion on June 15, 2021.  Dkt. No. 123 ("Pls. Summary

Judgment Filing").  Defendant filed its reply on October 13, 2021.  Dkt. No. 144 ("Reply").

## III.   LEGAL STANDARD

Defendants are entitled to summary judgment on a claim if they can "show[] that there is no

genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is

proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the

moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).

A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 324). To defeat a motion for summary judgment, the non-movant—in this case, Plaintiffs—"must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). A plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. IBM Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). "[T]he judge must ask

. . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at 252); *see also Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) ("To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a . . . jury's resolution of the parties' differing versions of the truth." (citing *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006))).

Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must construe that party's submissions "liberally and interpret them to raise the strongest arguments that they suggest." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999) (internal quotation marks and citation omitted). "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014); *accord Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). Proceeding *pro se*, however, "does not . . . relieve [a pro se party opposing summary judgment] from the usual requirements of" opposing such a motion. *Fitzpatrick v. N.Y. Cornell Hosp.*, No. 00-cv-8594, 2003 WL 102853, at *5 (S.D.N.Y. Jan. 9, 2003).

As was done in this case, "[i]f the moving party seeks summary judgment against a *pro se* litigant, the moving party is also required to notify the *pro se* litigant of the requirements of Rule 56 and Local Civil Rule 56.1." *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); *see* Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment Pursuant to Local Rule 56.2, Dkt. No. 78-1. "*Pro se* litigants are then not excused from meeting the requirements of Local Rule 56.1." *Id.* (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004)).

Here, in response to Defendant's Rule 56.1 statement and its motion for summary judgment, Plaintiff filed a 370-page document consisting of various exhibits and an ostensible table of contents including Plaintiff's commentary on those exhibits. *See generally* Pls. Summary Judgment Filing. Plaintiff's response does not comply with Local Rule 56.1(b), which requires that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). Plaintiff does not indicate how his commentary or any of the exhibits respond to any statements made by Defendant in Defendant's 56.1 Statement. And to the extent Plaintiff's commentary in his summary judgment filing states legal conclusions or unsupported allegations, it similarly fails to comport with Rule 56.1. *See id.* (requiring a "short and concise statement of additional *material facts*") (emphasis added).

Nor did Plaintiff file a memorandum in opposition to Defendants' motion for summary judgment. But "Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson*, 766 F.3d at 194. Thus, when deciding an unopposed motion for summary judgment, the district court need not "robotically replicate the defendant-movant's statement of undisputed facts and references to the record." *Id.* at 197. Instead, courts must "examine the movant's statement of undisputed facts and the proffered record support and determine whether the movant is entitled to summary judgment." *Id.*; *Vt. Teddy Bear Co.*, 373 F.3d at 244 ("[I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion."). "[W]here a *pro*

*se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali*, 678 F. Supp. 2d at 178 (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).  In light of Plaintiffs' *pro se* status, the Court has independently reviewed the complete record, including the entirety of Plaintiff's Summary Judgment Filing, to attempt to substantiate Plaintiffs' assertions but has been unable to find evidence supporting those assertions that demonstrates the existence of a disputed issue of material fact.

## IV.   DISCUSSION

### A.  Defendant Is Entitled to Summary Judgment on Plaintiff's Due Process Claim

No disputed issues of fact preclude the Court from granting Defendant's motion for summary judgment with respect to Plaintiff's due process claims.  The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  The Due Process Clause thus "bars arbitrary, wrongful government actions, and guarantees procedural fairness when a state action deprives a citizen of a protected interest in life, liberty, or property." *Wiesner v. Rosenberger*, No. 98 Civ. 1512 (HB), 1998 WL 695927, at *3 (S.D.N.Y. Oct. 6, 1998) (citing *Daniels v. Williams*, 474 U.S. 327, 330-32 (1986)).  "The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'" *Patterson v. City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). Generally, "the appropriate process depends on the balancing of three factors: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of such interest through the procedures used; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural

requirement would entail." *Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017), as amended (July 18, 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)) (internal quotation marks omitted).

"[A]lthough notice and a predeprivation hearing are generally required, in certain circumstances, the lack of such predeprivation process will not offend the constitutional guarantee of due process, provided there is sufficient postdeprivation process." *Catanzaro v. Weiden*, 188 F.3d 56, 61 (2d Cir. 1999); *Spinelli v. City of New York*, 579 F.3d 160, 170 (2d Cir. 2009) (same). "[N]ecessity of quick action by the State or the impracticality of providing any meaningful pre [-]deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Catanzaro*, 188 F.3d at 61; *Spinelli*, 579 F.3d at 170 (same); *see also W.D. v. Rockland Cty.*, 521 F. Supp. 3d 358, 386 (S.D.N.Y. 2021) ("[T]he Supreme Court has held that in some circumstances, procedural due process can be satisfied by a 'meaningful' post-deprivation remedy when 'quick action by the State' is necessary, or when 'any meaningful predeprivation process' would be 'impracticab[le],' including in an emergency.").

Thus, "where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist, or that affording predeprivation process would be otherwise impractical, the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion." *Catanzaro v. Weiden*, 188 F.3d at 63; *W.D. v. Rockland Cty.*, 521 F. Supp. 3d 358, 386 (S.D.N.Y. 2021) ("In [emergency] situations, 'due process is violated "only when an emergency procedure is invoked in an abusive and arbitrary manner."'") (quoting *Reynolds v. Krebs*, 336 F. App'x 27, 29 (2d Cir. 2009)).

> **i.   Defendant Reasonably Believed that Exigent Circumstances Justified Placing Plaintiff on Regulation Leave 1**

There is no genuine dispute that Defendant reasonably believed exigent circumstances required that Plaintiff be placed on immediate involuntary leave pursuant to Regulation 1 on

September 12, 2016.  Plaintiff made a number of bizarre comments, including claiming that a

coworker had given him a cupcake that was injected with a chemical, that hospital employees were

stalking him, and that such individuals were "wearing masks" that Plaintiff could "see through."

Defs. 56.1 Stmt. ¶¶ 29, 30, 32.  He also exhibited odd behavior, including covering his chair in

plastic and wearing latex gloves.  *Id.* ¶¶ 26, 38.  Plaintiff does not dispute that he made those

statements or behaved in such a manner.  It is reasonable that an employer would believe that an

employee behaving as Plaintiff did could possibly harm one of his co-workers, given his stated belief

that those co-workers were attempting to poison or injure him.  Indeed, hospital employees

expressed that they were "afraid for their safety" and Plaintiff's "department also felt that he would

be a danger to himself and other employees."  *Id.* ¶¶ 33, 35.  Plaintiff's undisputed behavior serves as

competent evidence supporting Defendant's belief that Plaintiff posed an immediate danger to

himself or others, as would justify his being placed on Regulation 1 leave.

Though Plaintiff attempts to rationalize some of his behavior, including by claiming that he

used gloves and protective gear because, for instance, he had an "allergic response to dust mites and

[a] toxic fluid leak," *see, e.g.,* Pls. Summary Judgment Filing, Dkt. No. 123-99 at 1, he does not

dispute that he engaged in such behavior, nor does he provide any evidence that he explained the

reasons for his behavior to Defendant at the time.  Because the Court is concerned here with

whether Defendant reasonably believed that exigent circumstances required Plaintiff's being put on

leave, Plaintiff's purported justifications for his behavior have little bearing on the Court's analysis.

### ii.   There Are No Disputed Facts as to Whether Plaintiff Received Adequate Post-Deprivation Process

In addition, the undisputed facts establish that Plaintiff received adequate post-deprivation

process.[2]  As to the first *Mathews* factor, it is certainly the case that Plaintiff had a significant interest

---

[2] Not to mention that Defendants offered Plaintiff some pre-deprivation process.  A labor employment specialist
employed by Defendants "allowed Plaintiff to express his concerns," and also provided Plaintiff with a letter notifying

in his employment.  *See Spinelli v. City of New York*, 579 F.3d 160, 171 (2d Cir. 2009) ("The Supreme

Court has 'repeatedly recognized the severity of depriving someone of his or her livelihood.'")

(quoting *FDIC v. Mallen*, 486 U.S. 230, 243 (1988)).

However, there was very little risk of any erroneous deprivation of such that interest, given

the procedures used in this case.  First, Plaintiff was provided of notice that he was being placed on

Regulation 1 leave by Ms. Singleton when she visited Plaintiff at his worksite on September 12,

2016.  Defs. 56.1 Stmt. ¶ 44.  After he was placed on leave, he was examined by a PRB-affiliated and

board-certified psychiatrist; Defendant considered that psychiatrist's report before determining to

continue Plaintiff's involuntary leave of absence.  Defs. 56.1 Stmt. ¶¶ 48–50.  Plaintiff was then

afforded a full hearing before NYC HHC's Personnel Review Board, where he was represented by

counsel.  *Id.* ¶¶ 50–51.  Plaintiff also appealed the decisions by PRB Hearing Officer and HHC to

maintain Plaintiff's involuntary leave.  *Id.* ¶¶ 57–58.  Plaintiff also sought reinstatement to his duties

and received another psychiatric evaluation.  Plaintiff does not dispute that this process was

constitutionally adequate.

Plaintiff's Summary Judgment Filing includes a letter written by Plaintiff to the EEOC

claiming that that there had been collusion between the PRB Hearing Officer Kohn and Harlem

Hospital Executives.  Dkt. No. 123-6.  However, Plaintiff has provided no evidence to support the

assertions in that letter, as is required to defeat a motion for summary judgment.  *Jeffreys v. City of New*

*York*, 426 F.3d 549, 554 (2d Cir. 2005) ("To defeat summary judgment, therefore, nonmoving

parties 'must do more than simply show that there is some metaphysical doubt as to the material

facts,' and they 'may not rely on conclusory allegations or unsubstantiated speculation.'") (quoting

---

him that he would be placed on involuntary leave of absences, pending a physician's evaluation, and that informed him
that he could draw on his accred leave time.  *Id.* ¶¶ 40, 44.  Plaintiff does not dispute that he was afforded that process,
which further bolster's the Court's determination that there is are no triable issues of fact as to whether Plaintiff's due
process rights were violated.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) and *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).  Plaintiff's bare, unsworn allegations are insufficient to create a disputed issue of material fact.

And finally, as to the final *Mathews* factor, the government plainly maintains an interest in maintaining safety in Defendants' workplace.  Accordingly, there are no disputed material facts that prevent the Court from concluding that Plaintiff was afforded adequate post-deprivation process. *See Coles v. Erie Cty.*, 629 F. App'x 41, 42 (2d Cir. 2015) (summary order) (affirming lower court's decision finding that there was no predeprivation violation where the plaintiff, a sheriff's deputy, suffered a *petit mal* seizure while an inmate was under her supervision, was placed on a leave of absence, was later notified of her right to a hearing and notice that she would be terminated because she was unable to perform the duties of her job).  Thus, Defendant's motion for summary judgment is granted to the extent it pertains to Plaintiff's due process claims.

**B.  Defendant's Motion for Summary Judgment on Plaintiff's Claims for Discrimination and Retaliation under Title VII and the ADA Is Granted**

**i.    Plaintiff's Claims for Discrimination and Retaliation under Title VII and the ADA Are Largely Time Barred**

Neither can Plaintiff establish his claims for discrimination and retaliation under Title VII or the ADA.  First, nearly all of Plaintiff's claims are time-barred.  "Title VII's administrative exhaustion provision requires that any complaint be filed with the EEOC within 300 days of the alleged discriminatory act." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (citing 42 U.S.C. § 2000e–5(e)(1)).  The same is true for claims brought under the ADA. *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999) (commenting that the plaintiff had 300 days to file an ADA complaint with the EEOC).  "It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's

discriminatory conduct." *Flaherty v. Metromail Corp.*, 235 F.3d 133, 137 (2d Cir. 2000); *Alleyne v. Am. Airlines, Inc.*, 548 F.3d 219, 222 (2d Cir. 2008) (quoting *Flaherty* for the same).

Here, Plaintiff filed a charge with the EEOC on May 7, 2018.[3]  *See* Defs. Rule 56.1 Stmt. ¶ 67.  Accordingly, any discriminatory or retaliatory acts that occurred prior to July 11, 2017 are time barred.[4]  Thus, to the extent Plaintiff attempts to raise instances of discrimination or retaliation that occurred in prior to those date—including his being placed on Regulation 1 leave on September 12, 2016—that conduct is time barred.

> ### ii.   There Are No Triable Issues of Facts with Regard to Conduct that Occurred After July 11, 2017

Indeed, the only relevant events that occurred within the limitations period are (1) the PRB's September 25, 2017 decision on Plaintiff's appeal; and (2) HHC's October 24, 2017 denial of Mr. Akinde's application to return to duty following a Regulation No. 1 Involuntary Leave of Absence. *See* Defs. 56.1 Stmt. ¶¶ 60, 65–66; *see also* Yaquoob Decl. Ex. 14 at 1.

> #### 1.   *There Is No Dispute that Neither Race Nor Disability Discrimination Played a Part in the PRB's Decision on Plaintiff's Appeal*

As to the PRB's decision on Plaintiff's appeal of Hearing Officer Korn's decision, there is no evidence to suggest that the PRB's decision was born out of race or disability discrimination.  Nor does Plaintiff appear to argue that it was.  Indeed, the only mention of the PRB appeal in Plaintiff's submission is his Summary Judgment Filing accusing the PRB Hearing Officer of colluding with HHC executives, but nowhere does that letter mention Plaintiff's race or disability.  While the Court

---

[3] Defendant does not include the charge Plaintiff filed with the EEOC in their submissions, including only Plaintiff's charge filed with the New York State Division of Human Rights.  However, Defendant includes a July 13, 2018 letter from HHC that references Plaintiff's federal charge number and the fact that his charge with the New York State Division of Human Rights was "dually filed" with his EEOC charge.  *See* Yaqoob Decl. Ex. A at 1.  Plaintiff has not submitted anything to suggest that is not the case.

[4] To the extent Plaintiff brings claims for hostile work environment under Title VII, those claims would also be time barred, since Plaintiff was placed on involuntary leave on September 12, 2016 and thus was functionally unable to enter his workplace, let alone experience a hostile work environment.

will construe Plaintiff's submissions liberally, the Court does not read into Plaintiff's summary judgment filings an assertion that he was discriminated against on the basis of race or disability in the PRB appeal.  The record does not support that inference.

Second, to the extent that Plaintiff's filings can be construed to argue that the statute of limitations should have been tolled during his appeal of the PRB hearing, "the pendency of a grievance, or some other method of collateral review of an employment decision, [does not] toll the running of the limitations periods."  *Delaware State Coll. v. Ricks*, 449 U.S. 250, 251 (1980); *see also, Francois v. New York City Dep't of Educ.*, No. 21-601, 2021 WL 4944458, at *2 (2d Cir. Oct. 25, 2021) (summary order) ("[C]ollateral review of an employment decision 'by its nature, is a remedy for a prior decision [and] not an opportunity to influence that decision before it is made.'") (quoting *Ricks*, 449 U.S. at 251).  Thus, "[t]he proper focus is upon the time of the acts, not upon the time at which the consequences of the acts became the most painful."  *Ricks*, 449 U.S. at 258.

Here, there is no question that the PRB's decision on Plaintiff's appeal constitutes collateral review of Defendant's decision to place Defendant on leave on September 12, 2016.  That decision expressly considered whether the PRB Hearing Officer had acted arbitrarily and capriciously in sustaining Plaintiff's involuntary leave of absence after the December 5, 2016 hearing.  *See generally*, Yaquoop Decl. Ex. 12 (discussing the PRB hearing and the PRB hearing officer's recommendations, and ultimately determining that the PRB hearing officer's actions were not arbitrary or capricious). Accordingly, the statute of limitations was not tolled during the pendency of Plaintiff's appeal of the PRB's decision.  *See Arias-Mieses v. CSX Transp., Inc.*, 630 F. Supp. 2d 328, 332 (S.D.N.Y. 2009) (determining that the appeal of the defendant's decision to terminate the plaintiff did not toll the statute of limitations).  Thus, any Title VII or ADA claims arising out of September 25, 2017 decisions on the PRB appeal are time barred.

2.  *Plaintiff Cannot Establish Race or Disability Discrimination in Connection with*
    *HHC's Denial of Plaintiff's Application to Return to Duty*

Similarly, Plaintiff does not mention HHC's October 24, 2017 denial of his application to

return to duty anywhere in his summary judgment submissions.  Thus, Plaintiff has provided no

evidence (or even arguments) to suggest that he was discriminated against or retaliated against on the

basis of his race or a disability as pertains to that denial.

And even if Plaintiff had raised the October 24, 2017 denial in his submissions, there would

still be no genuine issue of material fact that would preclude the Court from granting Defendant's

motion with regard to any claims of discrimination or retaliation based on that denial.  First, there is

no evidence that Plaintiff's race played a part in that denial.  Instead, Defendant's letter notifying

Plaintiff of the denial of his application to return to work mentions only that Defendant had

determined that there was no reasonable accommodation that would allow Plaintiff to perform the

essential functional duties of his role.  Simply put, the undisputed facts do not support a claim for

racial discrimination under Title VII.

Then, assuming that Plaintiff's Summary Judgment Filing could be read to raise an argument

that he was denied a reasonable accommodation under the ADA—which it does not—he still would

fail to establish a claim.  To establish a prima facie case of disability discrimination arising from

a failure to accommodate, a plaintiff must demonstrate that "(1) [he] is a person with a disability

under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability;

(3) with reasonable accommodation, [the employee] could perform the essential functions of the job

at issue; and (4) the employer has refused to make such accommodations." *Noll v. Int'l Bus. Machines*

*Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (alterations in original); *accord Berger v. New York City Police Dep't*,

304 F. Supp. 3d 360, 368-69 (S.D.N.Y. 2018).

Here, the duties of a coordinating manager expressly included the supervision of staff and

"managerial skills-leadership, prioritization, training, ability to delegate, performance monitoring,

and staff supervision." *See* Defs. 56.1 Stmt. ¶ 24–25. Plaintiff does not dispute that he was unable to perform those functions.

Plaintiff submits two psychiatric evaluations, one that stated that mental status was "unremarkable," and one that concluded "Oludotun Akinde has no psychiatric disorder and is capable of working." *See* Dkt. No. 123-4 at 3; Dkt. No. 123-79 at 5. But those reports are silent as to whether Plaintiff was capable of performing the duties of a coordinating manager-part B. At most, the evaluations state that Plaintiff was capable of doing general work. The relevant inquiry is whether Plaintiff can establish a disputed fact to whether he was able to satisfy the essential duties of his job *as a coordinating manager* with a reasonable accommodation. And notably, Dr. Cohen considered those evaluations in concluding that he could not do so. Thus, the undisputed facts do not support a claim for discrimination under the ADA.

Neither can Plaintiff establish a claim for ADA retaliation. To establish retaliation under the ADA, a plaintiff "must show that "he engaged in a protected activity, that he suffered an adverse employment action, and that a causal connection exists between that protected activity and the adverse employment action." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72–73 (2d Cir. 2019). "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Plaintiff cannot establish such a causal connection. First, there is no evidence of direct animus in this case, nor is there any evidence of discrimination against Plaintiff's fellow employees. As to temporal proximity, Plaintiff filed a lawsuit against the HHC on April 29, 2016, and was not denied his application to return to duty until October 24, 2017—more than a year after the alleged

protected activity.  That temporal gap is too attenuated to support a causal inference.  *See D'Alessio v. Charter Commc'ns, LLC*, No. 18-CV-2738 (NG) (LB), 2020 WL 5638721, at *7 (E.D.N.Y. Sept. 21, 2020) ("[A] temporal gap of over a year is too attenuated to support a causal inference."); *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005) (no causation found where more than a year passed between protected activity and adverse action for First Amendment claim).  Accordingly, the undisputed facts do not support a claim for ADA retaliation claims.  Thus, Defendant's motion for summary judgment is granted with respect to Plaintiff's ADA retaliation claims.

## V.      CONCLUSION

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED. The Clerk of Court is directed to mail a copy of this order to Plaintiffs, to terminate all pending motions, to enter judgment in favor of Defendants, and to close this case.

SO ORDERED.

Dated:  March 29, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge